**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| AKINTOYE LAOYE, | : | |
| Plaintiff, | : | Civ. No. 14-5195 (GC) (DEA) |
| v. | : | |
| UNITED STATES OF AMERICA, et al., | : | OPINION |
| Defendants. | : | |

**CASTNER, District Judge**

**I.     INTRODUCTION**

Plaintiff, Akintoye Laoye ("Plaintiff" or "Laoye") is proceeding with a Fourth Amended Complaint ("FAC"). Presently pending before this Court is Defendants, the United States of America's, the United States Immigration and Custom Enforcement's ("ICE"), Paul Silva's, Joseph Mazza's, Milena Mioduszewska's and Hathawn's (collectively the "Federal Defendants"),[1] Motion to Dismiss Counts I, II, III, IV and VI of Plaintiff's FAC against them. For the following reasons, the Federal Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART.

**II.     FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff was a resident of the United States, but now resides in Nigeria. He names the following as Defendants in this action:

1. United States of America

2. ICE

---
[1] The four named individuals moving to dismiss shall be collectively referred to as the "Individual Federal Defendants."

3. Paul Silva – Deportation Officer

4. Joseph Mazza – Deportation Officer

5. Milena Mioduszewka – Deportation Officer

6. Hathawn – Deportation Officer

7. Jane and John Doe agents of ICE

8. Jane and John Doe members of ICE Health Service Corps

9. Essex County

10. Jane and John Doe members of Essex County

11. Essex County Correctional Facility Medical Staff

The following allegations are taken from Plaintiff's FAC and are taken as true for purposes of this Opinion. (*See* ECF 81). Plaintiff entered the United States in 1996 as a J-2 non-immigration exchange visitor. (*See id.* ¶ 14). In 1998, Plaintiff adjusted his status to a F-1 non-immigrant when he began college. (*See id.* ¶ 15). In 2003, Plaintiff was convicted of endangering the life of a child in violation of N.J. Stat. Ann. § 2C:24-2(a). (*See* ECF 81 ¶ 16). Plaintiff was then charged with removability based on this conviction in 2004. (*See id.* ¶ 17). He was in ICE detention from February 2004 thru July 2006. (*See id.* ¶ 18). Subsequently, the Department of Homeland Security ("DHS") brought new removal charges against Plaintiff alleging he failed to maintain his F-1 student status. (*See id.* ¶ 20). In September 2007, an immigration judge found Plaintiff removeable as an "out of status" F-1 student. (*See id.* ¶ 21). In February 2008, the immigration judge denied voluntary departure and ordered Plaintiff to be deported to Nigeria. (*See id.* ¶ 22).

On January 31, 2010, Plaintiff was attacked on a public street by an off-duty police officer in Neptune, New Jersey. (*See id.* ¶ 23). He sustained a broken jaw which required a metal plate to be inserted. (*See id.*). Plaintiff states he suffers from Post-Traumatic Stress Disorder ("PTSD"),

anxiety and depression as a result of this incident. (*See id.* ¶ 24). Plaintiff then applied for a U non-immigrant visa as a victim of a violent crime. (*See id.* ¶ 25). While that was pending, he was detained at the Monmouth County Jail, Essex County Correctional Facility ("ECCF") and Hudson County Jail during 2011 to 2012. (*See id.* ¶ 26).

On or about June 25, 2012, Plaintiff was ordered removed after his U-visa application was denied. (*See id.* ¶ 27). However, because ICE failed to effectuate Plaintiff's deportation during the period described by law, he was instead placed under supervision. (*See id.*). Plaintiff's supervision order required him to wear an electronic monitoring device on his ankle and participate in the Immigration Supervision Appearance Program ("ISAP"). (*See id.*). Plaintiff reported weekly to the ISAP Office for six years. (*See id.* ¶ 28). Plaintiff suffered from panic attacks during his reporting appointments due to his PTSD from prior experiences with police officers. (*See id.* ¶ 29).

In 2013, Plaintiff suffered from pain in his jaw. (*See id.* ¶ 30). Plaintiff's primary care physician informed him that there was a defect in the plate in his jaw that was causing the pain. (*See id.* ¶ 31). Plaintiff was then subsequently advised he would have to undergo corrective jaw surgery that would require the removal of the electronic monitoring device on Plaintiff's ankle. (*See id.* ¶¶ 32-33).

Plaintiff informed his case worker at the ISAP Office that he would need the monitoring device removed for surgery. (*See id.* ¶ 34). The case worker informed Plaintiff he would need to instruct his deportation officer, which Plaintiff did. (*See id.* ¶ 35). The deportation officer then requested Plaintiff's doctor write a letter to memorialize the need for the monitoring device to be removed. (*See id.* ¶ 36). Plaintiff's doctor did so on or about January 13, 2014. (*See id.* ¶ 37).

However, the ICE officer requested a letter with more information which was done on January 20, 2014. (*See id.* ¶¶ 38-39).

Plaintiff then applied for and was granted financing from the Victims Compensation Office to pay for the surgery. (*See id.* ¶ 41). On February 11, 2014, the day of the scheduled surgery, Plaintiff reported to BI Incorporated to remove the electronic monitoring device. (*See id.* ¶ 42). However, Plaintiff was told that the office had not received a response from ICE regarding removing the electronic monitoring device. (*See id.*). Thus, Plaintiff was denied corrective jaw surgery and continued to experience pain and suffering which he does to the present day. (*See id.* ¶ 43).

In August 2014, Plaintiff states he filed a *pro se* complaint in this Court because ICE had failed to respond to his requests to remove the electronic monitoring device for the surgery. (*See id.* ¶ 44). In 2019, Silva advised Plaintiff he would be allowed to undergo the jaw surgery. (*See id.* ¶ 46). Plaintiff then reapplied to the Victims Compensation Office for approval for payment of the surgery. (*See id.* ¶ 47). While Plaintiff was waiting for a response to his inquiry for funding, Silva informed Plaintiff that ICE had decided not to allow him to undergo the surgery because of the delay. (*See id.* ¶ 48).

On December 6, 2019, Plaintiff was detained by ten ICE agents on aggravated felony grounds. (*See id.* ¶ 49). Plaintiff's pleas to the agents to not rush into his home for fear that the agents would aggravate his father who suffers from dementia went ignored. (*See id.* ¶ 51). During this December 6, 2019 detention, ICE agents joked that Silva "owed them big." (*See id.* ¶ 52). Plaintiff's father became upset during this incident. (*See id.* ¶ 53). Plaintiff sought permission unsuccessfully from the ICE agents to let Plaintiff turn himself in the next day so he could arrange for care for his father. (*See id.*).

Subsequently, on December 6, 2019, Plaintiff was placed in ECCF as a pre-trial detainee. (*See id.* ¶ 54). The same day he sought an emergency motion to cease and desist. (*See id.* ¶ 55). On December 9, 2019, four ICE agents attempted to place Plaintiff on a plane with the use of a document that erroneously stated that Plaintiff was ordered to be removed on aggravated felony grounds when Plaintiff only had an out-of-status charge. (*See id.* ¶ 56). The ICE agents though refused to read Plaintiff's emergency motion, calling it "trash." (*See id.* ¶ 57). Plaintiff sustained injuries to his neck and spine, suffered from an aggravated inguinal hernia, lost feeling in three fingers and suffered from worsening symptoms of his PTSD, anxiety and depression. (*See id.* ¶ 58).

On January 20, 2020, an ICE agent served Plaintiff with Warning for Failing to Depart that erroneously stated Plaintiff was ordered to be removed on aggravated felony grounds. (*See id.* ¶ 59). When Plaintiff told the agent he did not have any aggravated felony grounds, the agent told Plaintiff that he "was definitely an aggravated felon and nothing could change that." (*Id.*).

During this time of detention at ECCF, Plaintiff suffered from cysts to his body and face. (*See id.* ¶ 60). In February 2020, Plaintiff was moved from the medical tier at ECCF by Silva and ICE agents. (*See id.* ¶ 61). Silva and other ICE agents again tried to force Plaintiff onto a plane leaving the United States. (*See id.*). Whereupon, a nurse at ECCF informed Silva and ICE agents Plaintiff had an open wound on his face, but the agents said, Plaintiff is going to leave "the United States today no matter what." (*See id.* ¶ 62). Plaintiff protested this treatment stating he had an emergency stay of removal. (*See id.* ¶ 63). In a call to Plaintiff's mother from the plane, Silva threatened to make sure that Plaintiff was imprisoned when he arrived in Nigeria. (*See id.* ¶ 64). Plaintiff alleges four ICE agents threatened him with five years of federal jail time and filmed the

attempt to force Plaintiff onto the plane. (*See id.* ¶ 65). However, Plaintiff was returned to ECCF after another officer verified that Plaintiff had an emergency stay of removal. (*See id.* ¶ 66).

In February 2020, Silva and another ICE agent instructed that Plaintiff be placed in solitary confinement in contravention of his medical needs. (*See id.* ¶ 67). Plaintiff further alleges that Silver and other ICE agents commented to ECCF Officers "[c]an you believe this child molester thinks he's not an aggravated felon? Maybe his fellow detainees need to know what he's being held for." (*See id.* ¶ 68). Silva and the ICE agents ordered Plaintiff be placed in solitary confinement indefinitely and not be given law library access. (*See id.* ¶ 69). Silva told Plaintiff he would be back to pick him up after the stay was lifted. (*See id.* ¶ 70).

During his detainment at ECCF, ICE agents and ECCF officers told other detainees and inmates that Plaintiff was a federal informant and child molester. (*See id.* ¶ 71). At one point, Plaintiff states an Essex County sergeant entered Plaintiff's cell with other officers and ordered Plaintiff to remove his pants and had other officers take pictures of his genitals. (*See id.* ¶ 72). When Plaintiff claimed he told the officers he would report their behavior to ICE, an officer responded to Plaintiff, "[w]ho do you think ordered us to keep you locked up? This is just the beginning." (*See id.* ¶ 73). Plaintiff was further threatened by ECCF officers who told him that by the time ECCF officers were done with him, he would know how it felt to be abused and molested. (*See id.*).

During Plaintiff's time in solitary confinement, he was denied shower shoes after being purportedly told by an unknown officer that "Africans don't wear shoes." (*See id.* ¶ 76). Thus, Plaintiff stood on a garbage bag in the shower even though at the time he was experiencing involuntary spams and balance issues. (*See id.*).

6

During the COVID-19 pandemic, Plaintiff left his neck brace behind when he was moved to medical solitary confinement. (*See id.* ¶ 77). Plaintiff's requests for a new neck brace were denied. (*See id.*). On one other occasion, Plaintiff was served a meal consisting only of asparagus and bread. (*See id.* ¶ 78). The officer who served him laughed and said "[e]njoy your meal, you child molester. Let's see how you snitch on an empty stomach." (*See id.*).

Plaintiff states that ICE, ECCF and Essex County were aware or should have been aware that Plaintiff's medical needs were not being properly addressed. (*See id.* ¶ 79). Plaintiff suffered injuries which included worsening mental health, exacerbated PTSD, anxiety, depression, insomnia, neck pain, involuntary body spasms, loss of feeling in three fingers, jaw infections and a worsening inguinal hernia. (*See id.* ¶ 85).

On July 17, 2020, Plaintiff was served with a Warning for Failing to Depart which erroneously stated that Plaintiff was ordered removed in 2012 on aggravated felony grounds. (*See id.* ¶ 86). Plaintiff informed agents this was incorrect, but the only response Plaintiff got from an agent was that he had been "warned" about Plaintiff. (*See id.*).

In August 2020, Plaintiff was woken up as ICE agents told him to pack up. (*See id.* ¶ 87). Plaintiff was physically restrained and forced into a vehicle that drove him to a plane bound for Louisiana. (*See id.* ¶ 88). Upon arriving in Louisiana, Plaintiff made medical requests as his hernia was causing him pain. (*See id.* ¶ 91).

Plaintiff was shackled while in a wheelchair and placed on a second plan bound for Nigeria. (*See id.* ¶ 93). While on the plane, Plaintiff was given stool softeners as treatment, which caused him to soil himself. (*See id.* ¶ 94). Plaintiff states this treatment and events occurred as the result of the orders of Silva, Mazza, Mioduszewka and Hathawn. (*See id.* ¶ 95).

Plaintiff's FAC was filed by limited appointment pro bono counsel. It raises six causes of action; they are:

1. Excessive Use of Force (Count I);

2. Deliberate Indifference to Plaintiff's Serious Medical Needs (Count II);

3. Harsh Pretrial Conditions For Punitive and Retaliatory Purposes (Count III);

4. Equal Protection Violations (Count IV);

5. Federal Tort Claims Act ("FTCA") against the United States – related to the December 9, 2019 and August 2020 plane incidents (Count V); and

6. FTCA against the United States for deviating from the standard of medical care (Count VI).

Plaintiff seeks monetary damages from Defendants as relief. The Federal Defendants have filed a Motion to Dismiss Counts I, II, III, IV and VI of the FAC pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. Plaintiff, now proceeding *pro se*, opposes the Motion to Dismiss. The Federal Defendants have filed a Reply in Support of their Motion. Plaintiff has filed a Motion for Miscellaneous Relief.

### III. LEGAL STANDARD

The Federal Defendants have moved to dismiss citing to both Federal Rule of Civil Procedure 12(b)(1) for a lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. As noted by the United States Court of Appeals for the Third Circuit:

> Proceeding under Rule 12(b)(1) inverts the burden of persuasion. When presenting a Rule 12(b)(6) motion, the defendant bears the burden to show that the plaintiff has not stated a claim. *Kehr Packages*, 926 F.2d at 1409. But under Rule 12(b)(1), the plaintiff must prove the court has subject matter jurisdiction. *Id.* The two rules also treat the complaint's factual allegations very differently.

8

> Unlike Rule 12(b)(6), under which a defendant cannot contest the plaintiff's factual allegations, Rule 12(b)(1) allows a defendant to attack the allegations in the complaint and submit contrary evidence in its effort to show that the court lacks jurisdiction. *Mortensen*, 549 F.2d at 891. Thus, improper consideration of a merits question under Rule 12(b)(1) significantly raises both the factual and legal burden on the plaintiff. Given the differences between the two rules, "[a] plaintiff may be prejudiced if what is, in essence, a Rule 12(b)(6) challenge to the complaint is treated as a Rule 12(b)(1) motion." *Kehr Packages*, 926 F.2d at 1409.

*Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016).

### IV. DISCUSSION

The Federal Defendants make four arguments in their Motion to Dismiss; more specifically, the Federal Defendants argue as follows:

1. Counts I-IV against the United States and ICE should be dismissed due to a lack of jurisdiction;

2. Count VI should be dismissed for a lack of jurisdiction pursuant to the independent contractor exception of the FTCA;

3. The Court should not extend *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) to the constitutional claims raised in the FAC (Counts I-IV); and

4. The Individual Federal Defendants are entitled to qualified immunity.

These arguments are considered in turn.

#### A. Constitutional Claims (Counts I-IV) Against the United States & ICE

The United States and ICE argue that they are entitled to dismissal of Counts I-IV against them as raised in the FAC because Congress has not waived the federal government's sovereign immunity from lawsuits seeking damages based on constitutional claims. The United States and ICE are correct on this point.

Sovereign immunity bars any claims against the United States, federal agencies, and federal officials in their official capacities, unless the United States explicitly waives its immunity. *See, e.g., Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 72 (2001); *Lewal v. Ali*, 289 F. App'x 515, 516 (3d Cir. 2008); *Belt v. Fed. Bureau of Prisons*, 336 F. Supp. 3d 428, 436 (D.N.J. 2018). In other words, "the United States is not subject to suit for constitutional torts, including the civil rights claims Plaintiff seeks to raise, and is entitled to absolute sovereign immunity in this matter." *See, e.g., Pittman v. United States*, No. 21-10123, 2021 WL 2260518, at *2 (D.N.J. June 2, 2021) (footnote omitted).

Similarly, federal agencies and entities, like ICE are also immune from suit in civil rights matters, because they have not explicitly waived sovereign immunity. *See e.g., Webb v. Desan*, 250 F. App'x 468, 471 (3d Cir. 2007); *see also Gary v. Gardner*, 445 F. App'x 466–67 (3d Cir. 2011). "Sovereign immunity not only protects the United States from liability," but it also "deprives a court of subject matter jurisdiction over claims against the United States." *Richards v. United States*, 176 F.3d 652, 654 (3d Cir. 1999) (citing *United States v. Mitchell*, 463 U.S. 206, 212 (1983)).

Accordingly, this Court lacks subject matter jurisdiction over Counts I-IV against the United States and ICE because of sovereign immunity. This Court will therefore dismiss with prejudice Plaintiff's Counts I-IV against the United States and ICE.

B. Count VI – Independent Contractor Exception to the FTCA

Next, the United States argues that it is entitled to dismissal of Count VI of the FAC. To reiterate, in Count VI, Plaintiff brings a claim against the United States under the FTCA for purportedly deviating from and denying Plaintiff proper medical care. Under the FTCA, government employees whose acts and omissions give rise to liability include officers and

employees of any federal agency, but not "any contractor with the United States." 28 U.S.C. § 2671. According to the United States, ECCF is an independent contractor that provides medical care to detainees of ECCF, not the federal government. Thus, the United States argues Count VI fails because independent contractors are not federal actors and the acts and omissions giving rise to Count VI fell within the contractual purview of ECCF.

The Court finds the United States' argument in this particular case and on this particular point premature. *See, e.g., Chaverra v. United States*, No. 19-81, 2020 WL 5579554, at *6 (M.D. Ga. Sept. 17, 2020) (noting issue of whether claim against the United States under the FTCA is barred under the independent contractor exception is better addressed in a summary judgment motion rather than a motion to dismiss). Indeed, Plaintiff alleges involvement and in certain respects direction by ICE officers as it relates to some of the care (or lack thereof) he received at ECCF. *See Smith v. Steffens*, 429 F. Supp. 2d 719, 721 (E.D. Pa. 2006) (citing *Norman v. United States,* 111 F.3d 356, 357–358 (3d Cir. 1997) (other citations omitted) ("The critical factor used to distinguish a federal agency employee from an independent contractor is whether the government has the power "to control the detailed physical performance of the contractor."). The parties can engage in discovery that may be instructive prior to this Court making a ruling on whether the independent contractor exception to the FTCA is applicable in this case. The United States can renew this argument at the summary judgment stage should it choose to do so.

C. Counts I-IV Against Individual Federal Defendants

The Individual Federal Defendants next argue that Counts I-IV should be dismissed as this Court should not extend *Bivens* to the constitutional claims for damages raised in the FAC as to federal deportation officers. To reiterate, Count I seeks relief due to excessive force in 2019 and 2020 in attempting to effectuate Plaintiff's removal. Count II involves Plaintiff's claims that the

Individual Federal Defendants were deliberately indifferent to his medical needs. Count III raises issues related to Plaintiff's conditions of confinement and Count IV asserts Plaintiff's equal protection rights have been violated.

In *Bivens*, the United States Supreme Court recognized an implied private cause of action under the Fourth Amendment to recover damages against federal actors. *See* 403 U.S. at 389, 395-97. *Bivens* has *rarely* been extended to permit a cause of action for damages liability since it was issued in 1971. Indeed, since *Bivens*, the Supreme Court has expanded the *Bivens* remedy to other constitutional violations only twice: under the Fifth Amendment's due process clause, *Davis v. Passman*, 442 U.S. 228 (1979), and under the Eighth Amendment's prohibition against cruel and unusual punishment, *Carlson v. Green*, 446 U.S. 14 (1986). *See Egbert v. Boule*, 142 S. Ct. 1793, 1797 (2022) (emphasizing that the Supreme Court has "declined 11 times to imply a similar cause of action for other alleged constitutional violations") (citations omitted).

"The Supreme Court has cautioned on the separation of powers when courts expand *Bivens* causes of actions." *Marinaccio v. United States*, No. 21-11167, 2022 WL 2833960, at *15 (D.N.J. July 20, 2022) (citing *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (citation omitted)). The Supreme Court has reiterated that "Congress is far more competent than the Judiciary to weigh such policy considerations . . . and the Judiciary's authority to do so at all is, at best, uncertain." *Egbert*, 142 S. Ct. at 1803 (citations and quotations omitted). In *Egbert*, the Court provided that "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy, courts must refrain from creating [it]." *Id.* (quoting *Abbasi*, 137 S. Ct. at 1858).

There are two steps used to determine whether a claim under *Bivens* may lie: (1) "[a] court asks first whether the case presents 'a new *Bivens* context'—i.e., is it 'meaningfully different from the three cases in which the Court has implied a damages action[;]' and [(2)] if so, do 'special

factors' indicate that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 142 S. Ct. at 1803 (internal citation and quotation marks omitted). These two steps "often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* at 1803.

Under step one of the analysis, the Court will first examine whether Plaintiff's Counts I-IV are new *Bivens* contexts. "[A] new context arises when there are 'potential special factors that previous *Bivens* cases did not consider.'" *Egbert*, 142 S. Ct. at 1803 (citation omitted); *see also Abbasi*, 137 S. Ct. at 1864 ("[E]ven a modest extension is still an extension."); *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) ("[The Supreme Court's] understanding of a 'new context' is broad."). A "meaningful difference" sufficient to support a finding that a case presents a "new context" can be as minor as, *inter alia*, "the statutory or other legal mandate under which the officer was operating" or simply a "new category of defendants." *Abbasi*, 137 S. Ct. at 1857, 1860. Both of these examples are present here.

The Supreme Court has noted that there is not "an exhaustive list of factors that may provide a reason not to extend *Bivens*," but it has explained that separation of powers principles are "central" to the analysis. *Hernandez*, 140 S. Ct. at 743. The Supreme Court has provided that the proper separation of powers inquiry is "whether there is any reason to think that judicial intrusion into a given field might be harmful or inappropriate." *Egbert*, 142 S. Ct. at 1798 (citation and quotation marks omitted). "[E]ven a single sound reason to defer to Congress is enough to require a court to refrain from creating such a remedy." *Id.* at 1803 (citation and quotation marks omitted; *see also id.* at 1804 (noting if there are alternative remedial structures in place, that alone can be a special factor).

This District has recently analyzed whether to extend *Bivens* to a plaintiff's claim that an immigration officer used excessive force. *See Barry v. Zamar*, No. 19-10216, 2022 4774398, at *6-7 (D.N.J. Oct. 3, 2022). In *Barry*, the Court held as follows:

> Here, the Court finds that there are at least two "meaningful differences" identified in *Abbasi* present in this case. First, "the statutory or other legal mandate under which the officer[s] [were] operating" is distinct. *See id.* at 1860. ICE Officer Zamar was not enforcing criminal law, unlike in *Bivens*, but rather was enforcing immigration law because the Task Force was executing an immigration administrative warrant. *See* Opp'n at 9 ("[T]he evidence is undisputed that the task force went to Plaintiff's apartment to execute an *administrative* warrant not a criminal warrant.") (citation omitted) (emphasis added); *Tun-Cos v. Perrotte*, 922 F.3d 514, 520-25 (4th Cir. 2019) (holding that a search and seizure claim presented a new context because it "concern[ed] ICE agents' enforcement of the INA, rather than traditional law enforcement officers' enforcement of the criminal law"). Second, this presents a "new category of defendant[ ]". *See id.* at 1857. ICE Officer Zamar qualifies as a new category of defendant because as an ICE agent he is charged with the enforcement of immigration laws, not criminal laws. Because there are "meaningful differences" between Barry's claim and the three Supreme Court cases that recognized *Bivens* liability, this case presents a new *Bivens* context.
>
> Having found that Barry's claim presents a new *Bivens* context the Court must next determine whether any special factors counsel hesitation in extending *Bivens*. While the Supreme Court has "not attempted to create an exhaustive list of factors that may provide a reason not to extend *Bivens*," it has explained that separation of powers principles are "central" to the analysis. *Hernandez*, 140 S. Ct. at 743. The Supreme Court has provided that the proper separation of powers inquiry is "whether there is any reason to think that judicial intrusion into a given field might be harmful or inappropriate." *Egbert*, 142 S. Ct. at 1798 (citation and quotation marks omitted). "[E]ven a single sound reason to defer to Congress is enough to require a court to refrain from creating such a remedy." *Id.* at 1803 (citation and quotation marks omitted).
>
> Here, the Court finds that separation of powers principles present a special factor counseling hesitation in extending *Bivens* to Barry's claim. Specifically, this case arises out of actions to [ ] enforce an immigration law and Congress has a heavy hand in immigration enforcement. As the Fourth Circuit noted in *Tun-Cos v. Perrotte*,

14

> "Congress took steps to ensure that the protections it provided in the [Immigration and Nationality Act] would be exclusive of any additional judicial remedy." 922 F.3d at 526; *see also Nyanteng v. Thompson*, No. 21-10390, 2022 WL 2763552, at *17 (D.N.J. July 15, 2022) (declining to extend *Bivens* liability to ICE agent defendants after finding that "regulating the conduct of immigration agents [ ] risks intrusion into national security.").
>
> Additionally, "Congress's legislative actions [related to immigration law] persuasively indicate that Congress did not want a money damages remedy against ICE agents for their allegedly wrongful conduct, as indicated by its frequent amendment of the [Immigration and Nationality Act] and its repeated refusal to provide a damages remedy." *Tun-Cos*, 922 F.3d at 527 (citing REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302; Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009-546; Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214; Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978; Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359; Act of Oct. 20, 1976, Pub. L. No. 94-571, 90 Stat. 2703; Act of Oct. 3, 1965, Pub. L. No. 89-236, 79 Stat. 911; *see also De La Paz v. Coy*, 786 F.3d 367, 377 (5th Cir. 2015) ("Despite its repeated and careful attention to immigration matters, Congress has declined to authorize damage remedies against individual agents involved in civil immigration enforcement. The institutional silence speaks volumes and counsels strongly against judicial usurpation of the legislative function")). Because separation of power principles present a special factor, the Court declines to open the door to *Bivens* liability to the present context

2022 WL 4774398 at *6-7.

The Court's decision in *Barry* is persuasive in Plaintiff's case as it relates to Counts I-IV that Plaintiff brings against multiple ICE deportation officers. *See also, G.B. v. United States,* No. 21-8071, 2022 WL 18142526, at *4 (C.D. Cal. Sept. 30, 2022) (declining to extend *Bivens* to deliberate indifference and to denial of medical care claims from a pretrial detainee "[b]ecause Plaintiffs' claim is predicated on a different constitutional amendment regarding a different type of detainee than that in *Carlson*, the Court concludes that Plaintiffs' claim would be a "modest extension" of *Bivens* to a new context."). It is also worth noting that Plaintiff has other avenues to

pursue his rights, indeed, he has filed this FTCA action against the United States which remains pending in this Court. Thus, Plaintiff has alternative remedy structures available and has in fact done so. Accordingly, this Court will dismiss with prejudice Counts I-IV against Defendants Silva, Mazza, Mioduszewka and Hathawn as *Bivens* should not be extended to apply in Counts I-IV in this case.

### D. Qualified Immunity

The Individual Federal Defendants final argument is that they are entitled to qualified immunity on Counts I-IV. Such analysis though is unnecessary given that *Bivens* is not being extended to Counts I-IV for the reasons stated in the previous section.

### E. Plaintiff's Motion for Miscellaneous Relief

After the Federal Defendants' Motion to Dismiss was fully briefed, Plaintiff filed a Motion for Miscellaneous Relief. Plaintiff's Motion seeks to add exhibits to his response in opposition to the Motion to Dismiss. The Motion will be granted and this Court has considered them in arriving at its decision with respect to the Federal Defendants' Motion to Dismiss.

## V. CONCLUSION

Accordingly, for the foregoing reasons, the Federal Defendants Motion to Dismiss is granted in part and denied in part. Counts I-IV are dismissed with prejudice against the Federal Defendants. Count VI against the United States is not dismissed. The United States may seek to raise the issue of the independent contractor to Count VI at the summary judgment stage should it elect to do so. An appropriate Order will be entered.

DATED: February 28, 2023

GEORGETTE CASTNER
United States District Judge